**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**RHONDA L. BROOKS,**
            **Plaintiff,**

**v.**                                        **Civil Action No.: 3:13-cv-44**
                                             **JUDGE GROH**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**
            **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING
THAT THE DISTRICT COURT GRANT PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT IN PART [10], DENY DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT IN PART [12], AND REMAND THE DECISION OF THE
ADMINISTRATIVE LAW JUDGE WITH INSTRUCTIONS**

## I.   INTRODUCTION

On April 25, 2013, Plaintiff Rhonda L. Brooks ("Plaintiff"), by counsel Brian D. Bailey,

Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"),

pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g).

(Complaint, ECF No. 1).  On June 25, 2013, the Commissioner, by counsel Helen Campbell

Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the

proceedings.  (Answer, ECF No. 6; Administrative Record, ECF No. 7).  On July 24, 2013, and

August 15, 2013, Plaintiff and the Commissioner filed their respective Motions for Summary

Judgment.  (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 10; Def.'s Mot. for Summ. J.

("Def.'s Mot."), ECF No. 12).  Following review of the motions by the parties and the

administrative record, the undersigned Magistrate Judge now issues this Report and

Recommendation to the District Judge.

## II.    BACKGROUND

### A.    Procedural History

On May 20, 2010,[1] Plaintiff protectively filed an application under Title II of the Social Security Act for Disability Insurance Benefits ("DIB") and a Title XVI application for Supplemental Security Income ("SSI"), alleging disability that began on December 1, 2008.[2] (R. at 152). These claims were initially denied on August 26, 2010 and denied upon reconsideration on November 1, 2010. (R. at 92, 108). On November 8, 2010, Plaintiff filed a written request for a hearing (R. at 114), which was held before United States Administrative Law Judge ("ALJ") Karen Kostol on October 3, 2011 in Morgantown, West Virginia. (R. at 42, 125). Plaintiff, represented by counsel, Brian D. Bailey, Esq., appeared and testified, as did Eugene Czuczman, an impartial vocational expert. (R. at 49, 75). On November 21, 2011, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 21). On March 7, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1-5).

### B.    Personal History

Plaintiff was born on January 5, 1961, and was forty-nine (49) years old at the time she filed her DIB and SSI claims. (R. at 152). She earned an associate's degree in medical administration information technology. (R. at 51). Her prior work experience included work as a receptionist, pizza maker, store clerk, physical therapy assistant, telemarketer and telemarketer coach/supervisor, bookkeeper/secretary and satellite installer, and a medical transcriptionist. (R.

---

[1] Plaintiff's application for Social Security Benefits was completed over the phone on May 21, 2010 and stored electronically with the Social Security Administration at that time. (R. at 152).

[2] In Plaintiff's application for disability benefits, Plaintiff listed March 1, 2008 as the onset date of her disability (R. at 152). At the hearing on October 3, 2011, Plaintiff's counsel moved to amend the onset date to December 1, 2008. (R. at 47).

at 55-63).  Plaintiff was married and had no children at the time she filed her claim.  (R. at 50).

*C.*     ***Medical History***

    **1.**     **Medical History Pre-Dating Alleged Onset Date of December 1, 2008**

From Summer 2005 to Fall 2008, Plaintiff received medical treatment at Buckhannon Medical Care in Buckhannon, West Virginia for her psoriasis, thyroid issues and other medical issues such as strep throat, tonsillitis and chest soreness and pain. (R. at 188).  From Fall 2008 through the date of her application, Plaintiff received her primary medical care from Allyson Andrews, MS, at Tri-County Health Clinic in Rock Cave, West Virginia. (R. at 187).

On September 11, 2008, Plaintiff presented to Care Xpress with swelling in her feet. (R. at 272).  Plaintiff reported that the swelling began about two weeks prior but had been on and off for approximately one year; Plaintiff denied pain. (*Id.*).  Under history of present illness ("HPI"), the medical report includes a notation of "rest and elevation of feet" as a modifying factor. (*Id.*).  Under social history, the report notes that Plaintiff works at "Fox's Pizza" and is "on feet all day." (*Id.*).  As part of the exam, the physician noted pedal edema with the right foot being worse than the left and Plaintiff was advised to utilize compression stockings and to follow up with her primary care physician in two weeks. (R. at 273). Plaintiff also reported that she was not currently taking any medications. (R. at 274).

On September 18, 2008, Plaintiff underwent an examination by Allyson Andrews as a new patient at Tri-County Health Clinic. (R. at 275).  Ms. Andrews noted that Plaintiff presented with ankle swelling and pain in her right ankle worse than the left. (*Id.*).  Plaintiff complained of swelling in her hands and ankles, which ache when swollen. (*Id.*).  During the examination, Ms. Andrews noted psoriatic [sic] plaques along Plaintiff's shins and "mild edema in her lower legs."

(R. at 276). Ms. Andrews assessed Plaintiff as having pedal edema. (*Id.*).

On October 2, 2008, Plaintiff returned to Tri-County Clinic for a follow-up appointment regarding her pedal edema and weight gain and to review her laboratory test results. (R. at 278). Ms. Andrews noted that Plaintiff continued to experience fatigue and edema. (*Id.*). Ms. Andrews diagnosed Plaintiff with hypothyroidism and prescribed levothyroxine. (*Id.*).

### 2. Medical History Post-Dating Alleged Onset Date of December 1, 2008

On January 21, 2009, Plaintiff visited the Tri-County Health Clinic. (R. at 281). A Progress Note from that date indicates Plaintiff reported feeling tired and gaining weight but her edema had resolved. (*Id.*). During the examination, the treating physician noted no edema was present. (*Id.*). Plaintiff's hypothyroidism diagnosis remained unchanged and the physician recommended she continue her synthroid medication. (*Id.*).

On June 11, 2009, Plaintiff presented to Tri-County Clinic complaining of knots in her knuckles and bilateral pain in her elbows. (R. at 285). Plaintiff explained that the pain in her hands, fingers, elbows and ankles began approximately one year prior. (*Id.*). She furthered stated she experienced swelling and that it takes an hour to be able to move around in the morning. (*Id.*). During the examination, the treating physician, Ms. Andrews, noted "nodules along the PIP joints of the fingers bilaterally" with no ulnar deviation or other deformity. (*Id.*). In regard to swelling, Ms. Andrews noted no swelling in her hands but swelling in her right ankle. (*Id.*). Plaintiff also had psoriatic lesions along her legs, bilaterally. (*Id.*). Ms. Andrews assessed Plaintiff as having polyarthropathy, referred Plaintiff to a rheumatologist and ordered x-rays of Plaintiff's affected joints. (R. at 285-86).

On June 15, 2009, Plaintiff presented at St. Joseph's Hospital of Buckhannon for x-rays

of her right ankle and both hands, as ordered by her primary care physician, Ms. Andrews. (R. at 255). The x-ray of the right ankle showed no fracture or dislocation; however, soft tissue swelling was seen about the ankle. (*Id.*). The x-rays of Plaintiff's right and left hands were normal with no evidence of fractures, dislocation, or other bony or soft tissue defects. (R. at 256-57).

On June 25, 2009, Plaintiff returned to Tri-County Clinic for a two to three week re-check of her polyarthropathy and to review her lab results. (R. at 290). Ms. Andrews noted swelling along Plaintiff's hands and ankles, bilaterally. (*Id.*).

On August 28, 2009, Plaintiff underwent her six-month re-check at Tri-County Clinic with Ms. Andrews. (R. at 291). Plaintiff complained of feet swelling and explained she stopped taking her synthroid medication for hypothyroidism in hopes of improving her edema, but it did not improve. (*Id.*). During the examination, Ms. Andrews noted no clubbing or cyanosis in Plaintiff's extremities, but did note Plaintiff had "bilateral pitting pedal edema to the shins." (*Id.*). Ms. Andrews diagnosed Plaintiff with hypothyroidism and pedal edema and prescribed furosemide medication for excess fluid. (*Id.*).

On August 31, 2009, after receiving a referral from Ms. Andrews, Plaintiff underwent an examination by Dr. Haritha Narla, a rheumatologist. (R. at 260). Plaintiff presented with pain in her ankles, knees and hands and intermittent pain in her elbows, which she stated had been ongoing for one year. (*Id.*). Plaintiff also reported swelling in her feet. (*Id.*). She stated that she experienced intermittent lower back pain and stiffness that improved with activity. (*Id.*). Dr. Narla noted Plaintiff's past medical history of psoriasis, bad headaches and her thyroid problem. (*Id.*). When reviewing Plaintiff's symptoms during the appointment, Dr. Narla noted fatigue,

sleep disturbance, ankle swelling, joint pain, swelling, generalized aching and muscle pain. (R. at 261). During the examination, Dr. Narla identified signs of psoriasis and edema in Plaintiff's legs and ankles. (R. at 259). Dr. Narla diagnosed Plaintiff with polyarthralgias, tendinitis of the elbow, psoriasis, hip bursitis and osteoarthritis. (R. at 258). Dr. Narla recommended Plaintiff schedule a second appointment in four weeks, prescribed Naproxen and encouraged exercise. (*Id.*).

On September 8, 2009, Plaintiff presented to Tri-County Clinic for a two to four week follow-up visit with Ms. Andrews to re-check her pedal edema and review lab results. (R. at 294). Ms. Andrews noted that Plaintiff's pedal edema had improved but did not change her assessment of Plaintiff as having pedal edema. (*Id.*).

According to the medical records, Plaintiff's next hospital visit did not occur until January 6, 2010, when she presented to Care Xpress for a possible sinus infection; the record from the appointment does not discuss any symptoms related to her previous diagnoses. (R. at 295-97).

On May 14, 2010, Plaintiff returned to Tri-County Health Clinic and presented with water in her knees and continued swelling in her legs, which she reported stays constantly. (R. at 298). Plaintiff also stated that she is no longer seeing the rheumatologist due to cost constraints. (*Id.*). Plaintiff reported that "once when she had more fluid in her legs she had to sleep on four pillows." (*Id.*). During the examination, Ms. Andrews noted no clubbing or cyanosis in Plaintiff's extremities, but noted "moderate pitting edema bilaterally in the lower extremities." (*Id.*). Ms. Andrews assessed Plaintiff as having pedal edema and prescribed lasix with a follow-up appointment in a month as well as repeat lab work in one to two weeks. (*Id.*).

On June 1, 2010, Plaintiff presented to St. Joseph's Hospital Emergency Room with a migraine. (R. at 302-08). Plaintiff reported a history of migraine headaches. (R. at 302). In reviewing Plaintiff's symptoms, the physician noted muscle aches, fluid, joint pain and Plaintiff's thyroid condition. (*Id.*). During the general physical exam, the physician noted no pedal edema. (R. at 303). Plaintiff was diagnosed with a recurrent migraine headache and released from the hospital after her condition improved. (*Id.*).

On July 2, 2010, Plaintiff underwent a Mental Assessment conducted by Morgan D. Morgan, M.A. on behalf of the West Virginia Disability Determination Service. (R. at 309-13). The assessment included a mental status examination and clinical interview, which reviewed Plaintiff's chief complaints, presenting symptoms, mental health treatment and medical history, educational background, vocational history, development and social background and a description of her daily activities. (R. at 309-12). The assessment indicates Plaintiff has no mental health or substantive abuse treatment history. (R. at 310). Subjectively, Plaintiff's symptoms include a typically happy mood, though she becomes discouraged when she cannot perform tasks at her previous level due to body discomfort, a history of depression as a child, occasionally troubled sleep, adequate appetite with no weight fluctuations, occasional crying spells, variable energy level and no history of suicidal ideation. (R. at 311). Objectively, Mr. Morgan noted that Plaintiff was cooperative and compliant during the assessment, there was no abnormality in her posture or gait and her mood was cheerful and affect broad. (*Id.*). Plaintiff's immediate and recent memory as well as remote recall were within normal limits. (*Id.*). Plaintiff's concentration was also within normal limits. (*Id.*). Her insights were classified as mildly deficient, based on her statements during the mental status examination. (*Id.*). Plaintiff's

persistence was also described as mildly deficient, based on her presentation. (R. at 312).

Additionally, Plaintiff's pace was mildly deficient, based on observations of her personal tempo.

(*Id.*). Mr. Morgan listed no Axis I or II diagnosis, but noted Plaintiff's Axis III diagnosis as

"reported chronic lower back and hip pain, osteoarthritis, history of arthritis, hypothyroidism,

fluid retention, short of breath, migraines, and allergies." (R. at 311). Plaintiff received a "fair"

prognosis for psychological problems. (*Id.*).

On August 2, 2010, Dr. Bennett Orvik conducted a consultative medical examination on

behalf of the West Virginia Disability Determination Service. (R. at 319-25). Plaintiff informed

Dr. Orvik that she experiences pain in all her joints, particularly her knees and hips; she has

swelling in her knees at times as well as swelling in her lower legs, which is fairly prominent

sometimes; Plaintiff also reported she has back pain at times and struggles with stiffness in the

morning. (R. at 319). Plaintiff stated she experienced these problems for approximately two

years and that her condition has stayed the same over the last year. (R. at 320). Dr. Orvik further

noted that Plaintiff reported she experiences too much pain and stiffness to be able to work. (*Id.*).

Dr. Orvik listed Plaintiff's current medications as glucosamine and chondroitin, levothyroxine

and hydrochlorothiazide as needed for swelling. (*Id.*).

Dr. Orvik conducted a pain assessment. (*Id.*). Plaintiff explained that she experiences

pain in her knees, hips, shoulders, her lower back as well as other joints throughout her body.

(*Id.*). She stated she experiences pain everyday and characterized the pain as sharp and

sometimes aching. (*Id.*). On a scale of zero to ten, Plaintiff classified the pain as ranging from a

five to a ten. (*Id.*). The duration of the pain typically lasts about thirty minutes and is aggravated

by any increase in physical activity. (*Id.*). In order to treat the pain, Plaintiff reported that she

uses a heating pad and takes over-the-counter medication, such as Tylenol or ibuprofen. (*Id.*).

When conducting the physical examination, Dr. Orvik noted that Plaintiff has a "reasonably normal general appearance" with no scars, tattoos or skin pigmentary changes; he further commented that Plaintiff shows moderate obesity. (R. at 321). He stated her behavior is "generally consistent with her allegations of disability." (*Id.*). Dr. Orvik conducted an examination of Plaintiff's head, eyes, ears, nose and throat, neck, heart and abdomen noting no major concerns or abnormalities. (R. at 321-22). When examining Plaintiff's extremities, he noted that "she does have some psoriasis on her legs and her elbows...no areas of skin inflammation or ulceration." (R. at 322). Dr. Orvik further commented that no clubbing, deformity or cyanosis were present. (*Id.*). However, Dr. Orvik noted that Plaintiff has "1 to 2+ pitting edema of the ankle areas." (*Id.*).

In regard to the neurologic examination, Plaintiff reported no areas of numbness and her muscle strength appeared normal. (*Id.*). Dr. Orvik noted "deep tendon reflexes are faint in knees and ankles bilaterally." (*Id.*). When examining Plaintiff's range of motion, Dr. Orvik noted normal range of motion in Plaintiff's upper extremities, hip, ankle and cervical spine but Plaintiff did have "mildly decreased lumbar spine flexion and extension at eighty (80) degrees." (*Id.*). There were "no areas of joint inflammation, tenderness, swelling or deformity" in Plaintiff's joint and spine. (*Id.*). Dr. Orvik also noted that Plaintiff's stance and gait were normal. (*Id.*). Plaintiff could "tandem walk fairly well" and "walked well on her heels and some on her toes." (*Id.*). Plaintiff was able to bend at eighty (80) degrees. (*Id.*). Plaintiff completed "almost a complete squat," but "held on to the exam table" when squatting and rising from the squat position. (*Id.*). While at the appointment, Dr. Orvik noted that she did not have trouble getting

in and out of the chair or on or off the exam table. (*Id.*). Plaintiff also reported that she did not have trouble dressing or undressing and she could write fairly well and pick up small objects well. (*Id.*).

Dr. Orvik's diagnoses and impressions included: 1) Osteoarthritis, 2) Back pain consistent with lumbosacral strain, 3) Hypothyroidism, 4) Right eye nevus, 5) Migraine headaches, 6) Psoriasis, and 7) History of chronic lower leg edema. (*Id.*). In regard to Plaintiff's current treatment, Dr. Orvik noted that the "treatment appears to be reasonably appropriately [sic]." (*Id.*). As for the prognosis, Dr. Orvik commented that "prognosis is difficult to evaluate particularly since it is not clear exactly what type of arthritis she has" and noted that "it probably would be helpful for her to see a rheumatologist to clarify the diagnosis with regard to arthritis." (*Id.* at 322-23). Dr. Orvik's summary of Plaintiff's major complaints was diffuse arthritis and he found "actually relatively little in the way of positive physical findings." (*Id.* at 323).

Dr. Orvik then summarized Plaintiff self-reported limitations, which included that she can sit for about twenty (20) minutes before getting "very stiff," she can stand for about thirty (30) minutes and then her knees begin to hurt, she cannot walk very far because of arthritic-type pains and she cannot do much lifting or carrying because of knee and leg pain. (*Id.*). Dr. Orvik concluded that Plaintiff "claims to have lot [sic] of difficult with arthritis. It makes it very difficult for her to walk. She probably is need [sic] of a thorough examination by rheumatologist to further clarify exactly what her problems might be." (*Id.*).

On August 25, 2010, Dr. Marcel Lambrechts completed a Physical Residual Functional Capacity Assessment. (R. at 340-47). Dr. Lambrechts noted that Plaintiff can occasionally lift twenty (20) pounds, frequently lift ten (10) pounds, stand and/or walk at least two (2) hours in an

eight (8) hour workday, sit with normal breaks for about six (6) hours in an eight (8) hour

workday, and is unlimited in her ability to push and/or pull. (R. at 341). Because of Plaintiff's

pain in her lower extremities and swollen feet from edema, Dr. Lambrechts noted that Plaintiff

must periodically alternate sitting and standing to relieve pain or discomfort and specifically

stated that "at best she could stand and/or walk for up to three (3) to four (4) hours alternating as

needed." (*Id.*). In regard to postural limitations, Plaintiff can occasionally climb, balance, stoop

and kneel; she can never climb ladders, ropes or scaffolds, crouch or crawl. (R. at 342). Dr.

Lambrechts noted that while Plaintiff has psoriasis and arthritis in her hands, her range of motion

is normal and she has no manipulative limitations, such as reaching in all directions, handling,

fingering or feeling. (R. at 343). Plaintiff's environmental limitations include avoiding

concentrated exposure to extreme heat and vibration and avoiding even moderate exposure to

extreme cold and hazards, such as machinery and heights. (R. at 344). Dr. Lambrechts noted

"this lady is only partly credible. She has psoriasis and may have psoriatic arthritis as well but so

far her ROM [range of motion] is still considered to be good. She is limited and the RFC will

show her limitations. Her RFC has been reduced based on the physical reports." (R. at 345).

On February 4, 2011, Plaintiff presented to CareXpress for a recheck of her chronic

conditions and a sore throat. (R. at 357). Ms. Andrews noted Plaintiff's chronic medical

conditions as hypothyroidism and polyarthralgias, which involves psoriasis and "chronic

swelling in her lower extremities." (*Id.*). Ms. Andrews also stated that Plaintiff "has seen

rheumatology once and they think she has psoriatic arthritis, but she can't afford further testing

or f/u [follow up] with the rheumatologist." (*Id.*). When examining Plaintiff's extremities, Ms.

Andrews noted "no clubbing, cyanosis, she has psoriatic plaques and mild bilateral pitting

edema." (R. at 358).  Ms. Andrews assessed Plaintiff's conditions as including: 1) hypothyroidism, 2) pedal edema, 3) polyarthropathy, 4) tonsillitis.  (*Id.*).  Ms. Andrews also ordered x-rays of Plaintiff's hip.  (*Id.*).  The x-rays of the right hip indicated that Plaintiff's bones, joints and soft tissues were within normal limits and no evidence of a fracture.  (R. at 359).

On April 29, 2011, Plaintiff presented to CareXpress for a recheck of her hypthyroidism, pedal edema and polyarthralgia. (R. at 360).  The examination was conducted by Victoria Woolwine.  (R. at 361).  Plaintiff complained of being tired and not sleeping well due to pain in her right hip; she also stated her ankles and knees were puffy all the time and that the swelling gets worse when sitting.  (R. at 360).  Plaintiff requested and received a prescription for naprosyn, which helped in the past for Plaintiff's joint pain.  (*Id.*).  During the examination, Ms. Woolwine noted no swelling or tenderness to palpation in Plaintiff's knees and no edema in her extremities.  (*Id.*).  Ms. Woolwine assessed Plaintiff as having 1) hypothyroidism, 2) pedal edema, 3) polyarthropathy, and 4) hyperlipidemia - unspecified.  (R. at 361).  In regard to the treatment plan for hyperlipidemia, Ms. Woolwine noted that Plaintiff did not want to start medication, but instead preferred to try weight loss, low cholesterol diet and exercise.  (*Id.*).

On June 25, 2011, Plaintiff presented to CareXpress complaining of swelling in her feet, knees and thighs.  (R. at 362).  Plaintiff reported she experienced swelling in her joints for over two (2) years.  (*Id.*).  During the examination, the physician noted bilateral pedal/ankle edema and decreased range of motion of the ankles, knees and elbows bilaterally. (R. at 363).  The physician diagnosed Plaintiff with psoriatic arthritis and edema.  (*Id.*).  For treatment, the physician recommended to continue Plaintiff on her naproxen medication and recommended rest,

no salt or caffeine and indicated to "elevate legs while resting" and for Plaintiff to use medium compression hose as directed. (*Id.*).

D.      *Testimonial Evidence*

At the ALJ hearing held on October 3, 2011, Plaintiff testified that she was born on January 5, 1961 and was fifty years old and married at the time of the hearing. (R. at 49-50). Plaintiff stated she obtained an associate's degree in medical administration information technology. (R. at 51).

Regarding her employment history, Plaintiff testified that she most recently worked as a receptionist at H&R Block, a tax preparation service, from January 2009 to April 2009. (R. at 55-57). Plaintiff started the position working full-time but seemed to explain at the hearing that her hours were reduced and she began working altering days with the second receptionist. (R. at 55). In this position, Plaintiff greeted clients as they arrived, retrieved their file from upstairs, and then returned downstairs to put the files in order for the tax preparers. (*Id.*). When asked why she left the position, Plaintiff testified that she was often unable to come into work and explained that she "just...couldn't do it," then described walking up the stairs to retrieve clients' files, bending to get files out of filing cabinets on the floor and then returning downstairs with the files. (R. at 56).[3] While the files themselves were not heavy, Plaintiff explained that the difficulty stemmed from constantly having to retrieve the files from upstairs. (R. at 57). At the hearing, Plaintiff's counsel explained that this position occurred after the revised on-set date of December 1, 2008.[4] Plaintiff's counsel requested that her "short work attempt" be considered an

---

[3] Plaintiff later testified in response to her counsel's questioning that while the H&R Block office remained opened after April 16, she thought the only staff remaining were the manager and "another girl."

[4] Plaintiff's original alleged onset date was March 1, 2008. (R. at 47). At the hearing, Plaintiff's counsel moved to amend the onset date to December 1, 2008 in order to avoid classifying her short-term work in three positions (i.e., receptionist, pizza maker and store clerk), as unsuccessful work attempts. (*Id.*)

unsuccessful work attempt because "she did have to stop that work because of her medical condition." (R. at 47, 62).

Prior to the receptionist position, Plaintiff worked as a pizza maker from May 2008 to November 2008. (R. at 57). Plaintiff's job responsibilities required her to stand and knead dough as well as lift "heavy" trays containing eight to ten balls of pizza dough. (R. at 58). She worked full-time for approximately two or three months before reducing her hours because "it was getting to be too much." (*Id.*). Next, Plaintiff worked for about one month as a store clerk at the Dollar Store in hopes of working fewer hours. (*Id.*). However, Plaintiff testified that she struggled with standing constantly and bending over to place items into bags. (R. at 59). From April to May 2008, Plaintiff worked briefly as a physical therapy assistant. (*Id.*). Plaintiff explained she originally anticipated the position to entail the traditional duties of a receptionist, but in actuality the employer needed physical assistance during her patients' appointments. (R. at 60). This required bending, wiping off tables and some lifting, which Plaintiff said she could not perform. (*Id.*).

Prior to these positions, Plaintiff worked for approximately three years at a telemarketing company. (R. at 60). She first started as a telemarketer and then received a promotion to assistant and then full-time supervisor or "coach" (*Id.*). Plaintiff testified that she left the supervisor position because she was "[s]tanding all of the time" and bending to help agents on the phone. (R. at 61). She also experienced difficulty sitting for eight or six hours a day. (*Id.*). Then from 1995 to 2003, Plaintiff worked as a satellite installer and bookkeeper for her husband's business. (R. at 62). In these positions, she performed secretarial duties and also "climbed up on the house to...run the cable line." (*Id.*). Plaintiff testified that during this time

she had no difficulty performing her job duties. (*Id.*). Plaintiff also worked as a medical transcriptionist in a chiropractor office from July 2002 until 2003 during her last term in college. (R. at 63).

Plaintiff testified regarding her medical condition, specifically naming arthritis and swelling as two of the biggest problems she experiences. (R. at 64). She stated she has arthritis "in just about every joint I can think of" and experiences swelling in her ankles, knees, elbows and hands. (*Id.*). Plaintiff testified that she experiences joint pain everyday and cannot remember the last pain-free day. (R. at 64-65). The pain is located in her legs, feet, arms and hands and includes a burning sensation, dull aches and/or the feeling of pins and needles. (R. at 65, 68). When in pain, Plaintiff stated she cannot function, focus or concentrate. (R. at 64). When specifically asked about arthritic pain in her hands, Plaintiff explained she experiences pain in her wrist approximately two or three times a week. (R. at 65). Plaintiff stated she also began experiencing problems with the joints in her jaw, causing pain when she chews. (R. at 73).

In regard to the swelling, Plaintiff testified that swelling occurs everyday, however, the exact location and amount of the fluid may vary. (R. at 69). Plaintiff stated the swelling has been constant in her knees for the past eight months and is most prominent in her lower legs, below the knees. (*Id.*). When asked how she relieves the swelling, Plaintiff stated "[t]hey tell me to put my feet up above the level of my head, but at the same time, I've been sleeping for the past year with three pillows under my head to keep fluid from going around my heart of in my lungs." (R. at 70). Because of this, Plaintiff stated that she always keeps her head above her feet when laying down. (R. at 71). Plaintiff testified she also wears compression stockings but does not find them particularly useful in relieving the swelling. (*Id.*).

Regarding her medications, Plaintiff explained recent changes in her "fluid pill" medication. Plaintiff stated she had been taking her most recent "fluid pill" daily for approximately one year, which "seemed to help the fluid a little bit" but "it doesn't get rid of enough of [the fluid] to...do any good." (R. at 53). Plaintiff explained that she has not been able to take the daily dose of the "fluid pill" due to experiencing severe indigestion as a result of the medication. (*Id.*). Plaintiff further stated that she plans on requesting a new "fluid pill" from her doctor. (*Id.*). In regard to treating her joint pain, Plaintiff testified that she takes over-the-counter Aleve and prior to that she used Tylenol, which she no longer uses because she became immune. (R. at 68).

In addition to the arthritic condition and swelling, Plaintiff also testified regarding migraine headaches she experiences. (R. at 73). While Plaintiff testified that she had not experienced many migraines recently, she stated that she has suffered from migraines her whole life. (R. at 73). Plaintiff explained she recently suffered a migraine that was severe enough to go to the hospital; however, this was the first severe migraine requiring hospitalization she suffered since she was eighteen years old. (R. at 73-74). When asked by her attorney how many migraines she experienced since December 2008, Plaintiff responded two to three a month. (R. at 74). Plaintiff further testified that in addition to occasional migraines, she experiences headaches that prevent her from working approximately once a week. (*Id.*). In order to treat these headaches, Plaintiff typically takes Excedrin Migraine and has never received prescription medication. (*Id.*).

At the hearing, Plaintiff also testified regarding her daily activities. When Plaintiff's attorney asked what she thinks prevents her from working with respect to her impairment,

Plaintiff responded "I know I'm not able to work because I can't even do simple things around the house." (R. at 64). Plaintiff testified that her husband handles the chores around the house. (R. at 71). She no longer cooks in the kitchen unless her husband is home so she limits her meals to finger foods when home alone. (R. at 64). She also attempts to wash dishes, but the use of her hands results in swelling. (R. at 69). Plaintiff testified that on a typical day, she makes coffee in the morning and may fix breakfast and do dishes if she is able. (R. at 72). She rarely lifts objects and can only lift a gallon of milk with two hands. (R. at 67). Plaintiff only drives about fifteen minutes to doctor office appointments approximately once a month. (R. at 51). Plaintiff is able to read and can "sometimes" write and do math calculations. (R. at 54).

Due to the pain in her wrists, which occurs approximately two or three times per week, Plaintiff frequently drops objects, only wears no-button shirts and has trouble putting on undergarments. (R. at 66). Plaintiff testified that she no longer crochets, one of her favorite hobbies; she stated she is able to crochet for about ten minutes before her hands begin to swell. (R. at 67). Plaintiff also cannot wear any jewelry because of the swelling in her hands; as a result, her wedding ring had to be cut off in order to be removed. (R. at 69-70). Plaintiff also reported trouble sleeping. (R. at 71).

In the mornings, Plaintiff reported she is typically very stiff, which requires her to walk around for approximately an hour to get "un-stiff." (R. at 71-72). Plaintiff remains on the couch most of the day, only getting up to go to the bathroom. (R. at 67). When she experiences joint pain and swelling in her legs, knees or feet, she rarely walks or stands. (*Id.*). The pain and swelling also impact her balance so she no longer takes showers unless her husband is home to ensure she does not fall. (*Id.*). Plaintiff's social life is also very limited; Plaintiff testified that

she no longer makes promises to see family or friends because her health varies on a daily basis; she does not belong to any clubs, groups or organizations (R. at 72).

### E.    *Vocational Evidence*

Also testifying at the hearing was Eugene Czuczman a vocational expert.  (R. at 75-87). Mr. Czuczman defined the local region for his testimony as the state of West Virginia, including the five metropolitan statistical areas for the state, within which includes three counties from Ohio (Lawrence, Washington and Belmont) and two counties from Kentucky (Greenup and Boyd). (R. at 77).

Mr. Czuczman then discussed Plaintiff's vocational history over the past fifteen years, identifying the skill and exertion categories for each position as performed by Plaintiff and as generally performed in the national economy. (*Id.*).

Mr. Czuczman characterized Plaintiff's past work as a receptionist as customarily sedentary in exertion and semi-skilled; however, he noted that Plaintiff performed the job in combination with the duties of a file clerk, which is light in exertion and also semi-skilled. (R. at 77-78).  He classified her work as a pizza maker as customarily medium in exertion and skilled. (R. at 78).  Mr. Czuczman classified Plaintiff's work as a store clerk as light in exertion and semi-skilled.  (*Id.*).  He classified the physical assistant therapy assistant position as medium exertion and skilled work.  (*Id.*).  He classified the telemarketing position as sedentary in exertion and semi-skilled; however, Mr. Czuczman noted that Plaintiff performed this position in combination with work as a coach/supervisor, which is recognized as light in exertion and skilled work. (R. at 78-79).  He classified Plaintiff's work as a satellite installer as medium in exertion and skilled labor. (R. at 79).  Mr. Czuczman noted that the bookkeeper position was performed at

the same time as the satellite installer; he classified the bookkeeper position as sedentary in exertion and skilled work. (*Id.*). In regard to Plaintiff's work at this time, Mr. Czcuzman also stated that the testimony indicated Plaintiff worked as a secretary in combination with the satellite installer and bookkeeper positions; he classified the secretary position as sedentary and skilled work. (*Id.*). He classified the medical transcriptionist position as sedentary in exertion and skilled. (*Id.*).

Mr. Czcuzman furthered testified that Plaintiff acquired skills which could be utilized in other types of employment such as skills working with data, calculating, checking for accuracy, classifying, comparing, compiling, evaluating, recording information, inventory and customer service skills. (R. at 79-80).

In regard to Plaintiff's ability to return to her prior work, Mr. Czuczman gave the following responses to the ALJ's first hypothetical:

> Q: Assume a person with the same age, education, and work experience as the claimant with the following abilities: this person is capable of light exertional work with the ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently. However, this person is limited in – in standing and walking no more than three to four hours in an eight-hour work day. And this person must be allowed to sit or stand alternatively. This hypothetical individual can only occasionally claim [sic] ramps and stairs but can never climb ladders, ropes, or scaffolds. The individual can occasionally balance, stoop, kneel, or crawl and can do no crouching or crawling. The individual must avoid even moderate exposure to extreme cold and hazards and must avoid concentrated exposure to extreme heat and vibration. Could such a person perform any of claimant's past work as actually performed by the claimant or as generally performed in the national economy?

> A: The work as a receptionist as performed and as customarily performed, the work as a telemarketer as performed and as customarily performed, the work as a bookkeeper as performed and as customarily performed. I would say that would be it, Your Honor.

> Q: Using the same hypothetical, could this individual perform any other jobs that exist in the regional or national economy?

A:      Yes, Your Honor...Photographer machine operator; recognized under a DOT number of 207.685-018; light in exertion; unskilled; Specific Vocational Preparation of 2; recognized at 80,000 national; 900 regional. Assembler printed products; recognized under DOT number 794.687-010. It is light in exertion; unskilled; Specific Vocational Preparation of 2; 60,000 national; 200 regional...Locker room attendant; DOT number 358.677-014; light in exertion; unskilled; Specific Vocational Preparation of 2. We have 63,000 national; and for the region, 200.

(R. at 80).

Incorporating the above hypothetical, the ALJ then questioned Mr. Czuczman regarding Plaintiff's ability to perform other work in the national economy with additional limitations at varying exertional but unskilled levels.

Q:      I would ask you to take the same individual as in hypothetical one with the additional limitations – this hypothetical individual can do a light to sedentary type of job that allows lifting and/or carrying up to 20 pounds occasionally and up to 10 pounds frequently but can only stand or walk no more than two hours per eight-hour work day and sit for approximately...six hours per eight-hour work day. Would this affect the jobs that exist in the economy, and if so, please identify any jobs that remain.

A:      Your Honor, the photographic machine operator, assembler printed products, locker room attendant would still remain within the hypothetical with the additional clarification in hypothetical restrictions.

(R. at 81-82).

The ALJ then placed additional restrictions on the individual in hypothetical two and asked if that person could do any of Plaintiff's past work, such as her receptionist job:

Q:      I would ask you then to assume the same individual as in hypothetical two above with the additional limitation that such individual can lift no more than 10 pounds occasionally. And that would be sedentary work.

A:      And the additional restrictions as give?

Q:      Yes...Could this person do...any of her past work, such as her receptionist job or...transcription job?

A: Such a person could do the receptionist as done customarily. It would probably be difficult – I would say it would be difficult the way she was performing it because of the limitation of the two hours. She had indicated a lot of times she would be going back and forth. I could see it going more than two hours with the standing and walking. However, the way it's customarily – receptionist is recognized, it would be within those restrictions. As far as the telemarketer, no, that would not be possible with the way those restrictions are given. And as far as the bookkeeper is concerned, I would say it would make the bookkeeper job difficult also, Your Honor.

The following [other jobs]...fit within the hypothetical...

Ink printer; recognized under DOT 652.685-038. And this is sedentary; unskilled; SVP 2; 72,500 national; 250 for the region. Document preparer; sedentary; unskilled; Specific Vocational Preparation of 2; 58,000 national; 125 regional. And type copy examiner; DOT number 979.687-026; sedentary; unskilled, Specific Vocational Preparation of 2; 73,000 national; 375 regional.

(R. at 82-83).

Finally, the ALJ questioned Mr. Czuczman about Plaintiff's ability to work based on

Plaintiff's own testimony as to the severity of her condition:

Q: And then I'd ask the same individual...that had the above limitations listed before, and this person, because of pain and fatigue as well, would be unable to remain on task and concentrate for more than 10 percent of the day and may have to elevate their feet for – above chest level throughout the day from time to time, more than would be for the ordinary breaks of, for example, 15 minutes in the morning or 15 minutes in the afternoon or 30 minutes at lunch. They would need more breaks to elevate their feet during...

A: Okay.

Q: Now, would they – would there be any jobs for that person?

A: No. Such a hypothetical person would not be capable of performing any type of work.

(R. at 83-84).

Mr. Miller, Plaintiff's attorney at the hearing, then posed the following hypothetical to Mr. Czuczman:

Q:      If I could follow up on...one of the last questions the judge asked you...Could you tell me what is it about elevating one's feet to chest level that would preclude...this type of work?

A:      An individual can't reach. Therefore, they're going to be off task the entire time their legs are elevated at that level.

Q:      Mr. Czuczman, in the type of work that you've discussed here today, is there any allowance for an employee to lay down in a supine position outside of the normal breaks and lunch period?

A:      No there is not.

Q:      ...in this work...that you discussed here today, if an individual is not able to effectively use her hands to grasp small objects for – let's say, for two days out of the five-day work week, would that have any effect on this work you've discussed here?

A:      If she can't grasp anything at all for two whole days out of the week, she's not able to do the work.

Q:      What...if she can handle thinks like...a pen, something like that; but she can't repetitively grasp, and it's going to cause her to be less efficient; she can't do things as quickly as an unimpaired worker because she can't repetitively perform that grasping motion. Do you understand what I'm saying?

A:      I understand what you're getting back to – at. And if it's the ability to go ahead and use fine manipulation – locker room attendant, for example, is more of a glorified security guard that's unskilled. So the grasping in that is very minimal. You're grasping to grab some towels for somebody on occasion.

        Otherwise, something like a machine monitor position, like a photographic machine operator, it's occasional grasping in order to load the machine. So we're looking at occasional – one time out of every 45 minutes, the person has to load the machine.

        So, you know, things like that are a possibility. Now, with – what will be an issue to me and a concern to me and to get clarification from you, is that if her grasping capabilities decrease every time she does it, by the end of the day we're at a point she's not able to do any grasping at all, then I'm going to have to say she would

be uncapable [sic] of performing any type of machine monitoring position because she would be unable to load the machine by the end of the day.

(R. at 85-86).

A Report of Contact form completed by Patricia Dennison dated August 26, 2010 included a vocational analysis of Plaintiff. (R. at 214). The Report states that Plaintiff cannot perform her past work as described or as described in the national economy. (*Id).* However, Plaintiff can perform other work, such as a charge account clerk, mainspring winder and oiler and ink printer. (*Id).* The Report further states that while working Plaintiff must alternate sitting and standing, with standing or walking limited to three to four hours. (*Id.*). She must never climb ladders, crouch or crawl and may have occasional use of other postures. (*Id.*). Additionally, she has "limited near and far acuity at 20/40 with good eye." (*Id.*).

## F.      *Lifestyle Evidence*

On an adult function report dated June 2, 2010, Plaintiff explained that upon waking up in the morning, she experiences stiffness, particularly in her right hip and back, and has difficulty moving. (R. at 196). She typically waits two to four hours before her stiffness subsides so she is able to shower and dress. (R. at 196-97). To relieve the stiffness, Plaintiff alternates between sitting and walking. (R. at 197). Plaintiff stated that her knees retain water constantly, which prevents her from walking too long before her legs get weak. (R. at 196).

Regarding her ability to complete household chores, Plaintiff noted she performs some chores in the morning, such as putting clothes in the washer or dishes in the dishwater; however, she is no longer able to wash dishes by hand. (R. at 197). She completes laundry at times and is able to iron. (R. at 198). She is able to do light cleaning of the house, such as dusting the tops of

bookshelves or the television, as long as such cleaning does not involve bending or crouching down. (R. at 198). Plaintiff does not perform any yard work; she noted that walking on unlevel ground or down hills particularly hurts her hip, knees and back. (R. at 199). She does not care for the family pet, which leaves her husband to care for, feed, walk and bathe the dog. (R. at 197).

In regard to other aspects of her personal life, Plaintiff stated she used to care for her mother-in-law but was no longer able to maintain her care due to her own declining health. (R. at 197). Plaintiff stated she is able to drive a car as long as she is not dizzy or extremely tired. (R. at 199). Plaintiff also reported no difficulty managing money, such as paying pills or handling accounts. (R. at 199-200).

Additionally, Plaintiff noted that her medical conditions impact her sleep. (R. at 197). She experiences back and hip pain after laying in bed for ten to fifteen minutes. (*Id.*). Plaintiff stated she frequently wakes up from sleep or is kept awake due to this back and hip pain as well as sharp tingling in her hands and feet. (*Id.*). Plaintiff reported that during the day she takes naps due to fatigue and that she gets tired very easily. (R. at 197).

Regarding her personal care, Plaintiff noted that it is hard for her to walk, bend, sit or get back up from sitting, which impacts her ability to dress. (R. at 197). Because she is unable to bend normally, Plaintiff cannot put shoes, socks or pants on without pain. (R. at 196). The difficulty bending also impacts Plaintiff's ability to bathe and groom herself, particularly cleaning her legs and feet in the shower, cutting her toe nails, shaving her legs and fixing her hair. (R. at 197). Plaintiff is able to feed herself and use the toilet; however, Plaintiff noted she is considering purchasing a higher toilet seat to ease bank on back, hip and knees when using the

toilet. (R. at 197).

Plaintiff also described her ability to prepare meals and her cooking habits. (R. at 198). Plaintiff stated she uses a crock pot or microwave to prepare at least one meal a day as she is no longer able to stand to cook at the stove. (*Id.*). When roasting meats, Plaintiff relies on her husband to lift the roast in and out of the oven. (*Id.*). Plaintiff further explained that she frequently drops things in the kitchen and that she is no longer able to use her hands to knead dough so she uses a bread machine. (*Id.*). Additionally, Plaintiff noted that she has difficulty following recipes accurately, staying focused and concentrating while she is cooking. (*Id.*).

Regarding shopping, Plaintiff reported that her husband does approximately 90 percent of the grocery shopping. (R. at 199). She is unable to lift or carry a heavy amount of groceries. (*Id.*). If she does go to the grocery store, she will typically just purchase one or two items; she makes these trips to the store once or twice a week for small items such as bread or detergent. (*Id.*).

Plaintiff's hobbies and interests include reading, fishing, walking, crocheting, sewing, painting, crafts and puzzles. (R. at 200). However, due to Plaintiff's medical conditions, she reported that she is no longer able to focus and concentrate in order to read for as long as she used to, she has not fished in years and would unlikely be able to cast the line with the pain in her elbows and hands, and she can only crochet or sew for about five to ten minutes before her wrists and hands become cramped and painful. (*Id.*). Plaintiff stated her social activities were fairly limited. (*Id.*). Due to her difficulties in the morning and pain she experiences, Plaintiff is no longer able to be ready early enough in the mornings to attend regular breakfasts with her former co-workers. (*Id.*). She speaks to her neighbor outside and talks to her mother and

mother-in-law on the phone about two times per week. (*Id.*).  At least once a week, Plaintiff travels with her spouse to her mother-in-law's nursing home for visits; she noted that she does not always need someone to accompany her, but sometimes she does. (*Id.*).  Plaintiff further explained that her social activities have changed since the onset of her medical conditions because she frequently cancels scheduled plans due to her health; as a result, she no longer plans events or outings with friends or families in advance. (R. at 201).

Regarding the impact of her medical condition on her abilities, Plaintiff noted that her conditions affect: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, stair climbing, memory, completing tasks, concentration, following instructions and using hands. (*Id.*).

### III.    CONTENTIONS OF THE PARTIES

In her motion for summary judgment, Plaintiff asserts that the Commissioner "committed numerous errors of law and had no substantial evidence to support her decision."  (Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 15, ECF No. 11).  Specifically, Plaintiff alleges that:

- The ALJ erred by forming a Residual Functional Capacity without including Plaintiff's need to elevate her legs during non-scheduled breaks. (*Id.* at 5).

- The ALJ erred by finding Plaintiff not credible because she compared Plaintiff's statements to the residual functional capacity assessment, rather than evaluating the statements against the entire case record as required by SSR 96-7p. (*Id.* at 9-10).

- The ALJ mischaracterized the record by finding Plaintiff's employment as a receptionist at a tax office to be an unsuccessful work attempt and then later finding the same work to

26

be a substantial, gainful activity; by stating Plaintiff worked as a "tax preparer" when she never held such a position; by claiming Plaintiff only received treatment from one primary care physician; by stating that Plaintiff only saw a rheumatologist once which implied "additional visits were not warranted" when the record indicates that Plaintiff did not make additional visits due to cost constraints; by discrediting Plaintiff's failure to use pain medication while not addressing Plaintiff's use of medication to control her edema; and by finding that Plaintiff was not significantly limited in her daily activities, which contradicts evidence in the record. (*Id*. at 11-15).

Plaintiff asks the Court to reverse the Commission's decision or "remand this case for the proper evaluation of Ms. Brooks' RFC and credibility." (*Id*. at 15).

Defendant, in his motion for summary judgment, asserts that "[s]ubstantial evidence supports the administrative law judge's decision that Plaintiff was not disabled." (Def.'s Br. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 1, ECF No. 13). Specifically, Defendant alleges that:

- The ALJ finding that Plaintiff did not need to elevate her feet to chest level throughout the day outside of ordinary work breaks was supported by substantial evidence. (Def.'s Br. at 9).

- The ALJ's finding that Plaintiff's subjective complaints were not fully credible was supported by substantial evidence. (*Id*. at 12).

- In Plaintiff's Amended Response to Defendant's Brief, she reasserts that the ALJ "committed numerous errors of law and had no substantial evidence to support her decision." (Pl.'s Am. Resp. at 9, ECF No. 15). Plaintiff specifically clarifies that:

- The ALJ "cherry-picked" the record and that the arguments raised by the Defendant are "post-hoc rationalizations not utilized by the Agency and, thus, carry no weight in this Court." (Pl.'s Am. Resp. at 1).

- The ALJ erred by not providing a definitive answer on whether Plaintiff's work as a receptionist at the tax office constituted substantial gainful activity or an unsuccessful work attempt.  (*Id*. at 4).

- The ALJ committed clear error of law by considering Plaintiff's limitations against the residual functional capacity assessment, not the entirety of the record.  (*Id*. at 6).

- The ALJ selectively cited the record and failed to address evidence that is "totally and completely contrary to the ALJ's position."  (*Id*. at 7-8)

## IV.    STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied.  *See* 42 U.S.C. § 405(g) ("The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).   The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion."   *Richardson v. Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence.  *See Laws v. Celebrezze*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962).

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has defined substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. *Laws,* 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, "the language of § 205(g)…requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V. DISCUSSION

### A. *Standard for Disability and the Five-Step Evaluation Process*

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If

you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings…and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record…"

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not

disabled at any of the five steps, the process does not proceed to the next step. *Id.*

## B.    *Discussion of the Administrative Law Judge's Decision*

Utilizing the five-step sequential evaluation process described above, the ALJ made the

following findings:

1. **The claimant meets the insured status requirements for a Period of Disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act so as to be insured for such benefits since December 1, 2008.**

2. **The claimant has not engaged in substantial gainful activity since December 1, 2008, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq*).**

3. **Since December 1, 2008, the claimant has had the following severe impairments: history of psoriasis; psoriatic arthritis/polyarthropathy, with edema in the lower extremities and hands; and osteoarthritis (20 CFR 404.1520(c) and 416.920(c)).**

4. **Since December 1, 2008, the claimant has not had an impairment or combination of**

impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. Since December 1, 2008, the claimant has had the residual functional capacity to perform a range of work activity that: requires no more than a light level of physical exertion; requires standing/walking of not more than three to four hours per day and affords a sit/stand option; requires no crouching, crawling, or climbing of ladders, ropes or scaffolds or more than occasional balancing, climbing ramps/stairs, kneeling and stooping; avoids moderate exposure to extreme cold or hazards (e.g. dangerous machinery, unprotected heights); and avoids concentrated exposure to extreme heat or vibration (20 CFR 404.1567(b) and 416.967(b)).

6. The claimant is capable of performing past relevant work as a telemarketer. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2008, through the date of this decision  (20 CFR 404.1520(f) and 416.920(f)).Act, from December 1, 2008, through the date of this decision  (20 CFR 404.1520(f) and 416.920(f)).

(R. at 23-29).

## C.    *Analysis of the Administrative Law Judge's Decision*

### 1. Failure to Include Elevation of Plaintiff's Feet to Chest Level During the Work Day Outside of Ordinary Breaks in Residual Functional Capacity

Plaintiff argues that the ALJ erred by not including elevation of feet as a limitation stemming from Plaintiff's leg edema in the residual functional capacity ("RFC") finding.  (Pl.'s Br. at 5).  Plaintiff asserts that the ALJ "accepted the severity of Ms. Brooks' leg edema, heard testimony concerning limitations caused by Ms. Brook's leg edema, and even created a hypothetical question accounting for Ms. Brooks' need to elevate her feet due to her leg edema" but that the ALJ then failed to "carry-over these limitations to the RFC." (*Id*. at 5).  Defendant responds in their brief that the ALJ's finding that Plaintiff did not need to elevate her feet to

chest level throughout the work day outside of her ordinary work breaks was supported by substantial evidence. (Def.'s Br. at 10). Defendant explains that "[t]here is nothing in the record, apart from Plaintiff's testimony, supporting Plaintiff's position that it was a medical necessity for her to lift her feet to chest level throughout the work day outside of her normally schedule breaks." (*Id.*). Defendant further states that elevation is only mentioned once in the record. (*Id.*)

During the hearing, Plaintiff testified that "[t]hey tell me to put my feet up above the level of my head" but that she also sleeps with pillows under her head to "keep fluid from going around my heart or in my lungs." (R. at 70). Plaintiff explained that she lays on the couch and always keeps her head above her feet. (R. at 71). The vast majority of Plaintiff's medical records contain complaints of edema, primarily in Plaintiff's feet or ankles. However, the record contains just two references to elevation of feet. First, on September 11, 2008, a record from CareXpress lists "rest and elevation of feet" as a modifying factor for Plaintiff's feet swelling. (R. at 272). Second, on June 25, 2011, Plaintiff again visited CareXpress regarding swelling in her feet and the physician prescribed naproxen, recommended rest and noted "elevate legs while resting." (R. at 363).

The Court finds that the ALJ did not error by asking the VE a hypothetical including the limitation of leg elevation outside of normal work breaks and then excluding such limitation in her final RFC. The ALJ must pose hypotheticals to the Vocational Expert ("VE") that "fairly set out all of [the] claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (alteration in original); *see also Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005) (stating that hypotheticals must "adequately" describe the claimant's impairments). However, the ALJ

need only include those limitations supported by the record in the hypotheticals. *Johnson*, 434 F.3d at 659. Furthermore, an ALJ is not required to "submit to the [VE] every impairment alleged by a claimant." *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) (alteration in original). In addition, an ALJ is not required to accept the answers a VE gives to a hypothetical that contains limitations not ultimately adopted by the ALJ. *See Hammond v. Apfel*, 5 F. App'x 101, 105, 2001 WL 87460, at *4 (4th Cir. Feb. 1, 2001) (citing *Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1986) (stating that "[b]ased on an evaluation of the evidence, the ALJ was free to accept or reject restrictive hypothetical questions")). Here, the ALJ chose not to adopt the limitation proposed to the VE in the hypothetical and the Court finds substantial evidence supports this decision.

Additionally, the ALJ did not error by failing to include a narrative discussion on why Plaintiff's alleged limitation of leg elevation to chest level was not adopted as part of the RFC. The Court finds that there is no objective evidence to suggest that Plaintiff has such a limitation, so there is no requirement that the ALJ must specifically mention leg elevation and her reasons for not including such a limitation in the RFC. While Plaintiff did testify at the hearing that she elevates her feet, Plaintiff did not mention the need to elevate her legs to chest level in her Disability Report supplied to the SSA (R. at 183-90), or in her Personal Pain Questionnaire (R. at 191-95) or in her Adult Function Report (R. at 196-203). The record references leg elevation twice, both during visits to CareXpress; Plaintiff's treating physician, Ms. Andrews, however, never noted elevation of legs as a recommended treatment in her many medical notes. Additionally, the two references to leg elevation in the medical record do not specifically note that Plaintiff must elevate her feet to chest level or that she must elevate her legs for a length of

time outside of normal breaks at work. Plaintiff's testimony at the hearing also does not indicate she must elevate her legs for a specific length of time outside of normal work breaks. Moreover, the ALJ does explain in her decision why the objective evidence contradicts Plaintiff's subjective allegations of limitations due to pain and fatigue, and why the RFC fully accommodates Plaintiff's symptoms. Therefore, the Court finds that there is no error based on the ALJ's exclusion from the RFC of the specific limitation that Plaintiff was required to elevate her feet to chest level during the day and there is no error for the ALJ's exclusion of a narrative discussion as to why the leg elevation limitation was not included in the RFC.

**2. Whether the ALJ Correctly Considered Plaintiff's Credibility**

The remaining issues raised by the Plaintiff concern whether the ALJ correctly considered Plaintiff's credibility. The determination of whether a person is disabled by pain or other symptoms is a two-step process. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* 20 C.F.R. § 404.1529(c)(1); SSR 96-7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medial evidence an impairment capable of causing the degree and type of pain alleged. *See Craig*, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of her subjective allegations of pain in light of the entire record. *Id.*

Social Security Ruling 96-7p sets out some of the factors used to assess the credibility of an individual's subjective allegations of pain, including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

34

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and,

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. *Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984).

**(a) Comparing Plaintiff's Subjective Allegations Against the Residual Functional Capacity Rather Than the Entire Case Record**

When making a finding on credibility, Plaintiff argues that the ALJ incorrectly weighed Plaintiff's statements regarding the limiting effects of her impairments against the "residual functional capacity assessment" and not the "entire case record" as required by SSR 96-7p. (Pl.'s Br. at 9). The ALJ writes: "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the *above residual functional capacity assessment*." (R. at 26) (emphasis added). The ALJ then

provides an in depth analysis as to the factors that undermine the claimant's allegations regarding the severity of her impairments in reference to the entire case record. (See R. at 26-28). The ALJ's analysis indicates that the sentence at issue contains a typographical error rather than an error of law in the credibility analysis applied by the ALJ. The decision shows that the ALJ considered the entire record in making the credibility determination. Accordingly, the error is harmless.

**(b) Whether the ALJ Erred in Making Credibility Determinations Based on Mischaracterizations of Evidence**

Plaintiff asserts that the ALJ's decision was "based on mischaracterizations of the record," which resulted in her reliance on "evidence that can only be described as faulty and irrelevant" and thus such mischaracterized evidence should not be considered "substantial evidence." (Pl.'s Br. at 11).

*i. Classifying Plaintiff's work at H&R Block as an Unsuccessful Work Attempt and Substantial Gainful Activity*

Plaintiff argues that the ALJ erred by first finding that Ms. Brooks had an unsuccessful work attempt when working as a receptionist at a tax office from January to April 2009, after her alleged on-set date, and then later stating Plaintiff was not credible because she worked a substantial gainful activity level in this same position. (Pl.'s Br. at 11-12). In sum, Plaintiff argues that the "ALJ cannot have it both ways" and that making a "contrary conclusion in a later part of the decision" is clear error. (Pl.'s Br. at 12). In response, Defendant explains in a footnote that:

> Although Plaintiff is correct that the ALJ would have been completely justified to end her inquiry at step one of the sequential evaluation process due to Plaintiff's performance of substantial gainful activity, the ALJ chose to give Plaintiff the benefit of the doubt and continue on to step five. This did not constitute error and if so, it was an error in

Plaintiff's favor.

(Def.'s Br. at 11, n. 4).

The first step of the five-step sequential evaluation process requires the ALJ to determine whether the claimant is engaged in substantial gainful activity. *See* 20 C.F.R. 404.1571, *et.seq.*. If the claimant is able to engage in substantial gainful activity, then the claimant is not disabled. *See* 20 C.F.R. 404.1571. Substantial work activity is defined as "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. 404.1572(a). Gainful work activity is defined as "work activity that you do for pay or profit." 20 C.F.R. 404.1572(b).

At the first step, the ALJ found that "in giving the claimant the utmost benefit of the doubt" Plaintiff's work as a receptionist for a tax office from January 19, 2009 through April 16, 2009 was an "unsuccessful work attempt." (R. at 23). The ALJ justified the finding by explaining that "the claimant had a significant break in employment, the work lasted only three (3) months, the claimant reported she frequently missed work and received assistance from other employees, and the claimant testified that she left this job because of her impairments." (R. at 23-24). The ALJ specifically made a finding that "[t]he claimant has not engaged in substantial gainful activity since December 1, 2008, the alleged onset date." (R. at 23). By making this finding, the ALJ then proceeded to the remaining steps of the sequential evaluation process.

At step four of the sequential evaluation process, the ALJ determines the claimant's residual functioning capacity ("RFC"). Under the Social Security Act, a claimant's RFC represents the most a claimant can do in a work setting despite the claimant's physical and

mental limitations. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1) (2011). When there is a determination of whether a person is disabled based on pain or other symptoms, the ALJ follows a two-step process by first considering objective medical evidence demonstrating an impairment capable of causing the pain alleged and second considering the plaintiff's subjective allegations of pain. *See Craig*, 76 F.3d at 594.

When assessing the severity of Plaintiff's subjective allegations of pain and other symptoms, the ALJ found a number of "factors that undermine the credibility of the claimant's allegations." (R. at 26). In support of her credibility determination, the ALJ pointed to the fact that "the claimant worked full-time after the alleged onset date at substantial gainful activity level as a tax preparer for the entire tax season until the job ended." (*Id.*). The ALJ discredits Plaintiff's statement that "she stopped because of her impairments" and finds instead that she stopped working because the position was "seasonal work." (*Id.*).

The Court finds that, standing alone, the classification of Plaintiff's work as both an "unsuccessful work attempt" and "substantial gainful activity" is harmless error. "The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008); *see also Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (stating that "[t]he doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions"); *Hurtado v. Astrue*, 2010 WL 3258272, at *11 (D.S.C. July 26, 2010) (finding that "[t]he court acknowledges there may be situations in which an error in an opinion is harmless because it would not change the outcome of the ALJ's decision"); *cf. Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n. 8 (4th Cir. 2004) (explaining that

"[w]hile the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached."). Even though the ALJ considered Plaintiff's work after her alleged on-set date as undermining Plaintiff's credibility, this was just one factor considered in addition to many others, such as receiving little treatment, not taking prescription pain medication, and recently reporting she wanted to start exercising. (R. at 28). Therefore, the error is harmless because the ALJ's reference to Plaintiff's employment at a "substantial gainful activity" level at step four in her analysis is just one of many reasons the ALJ used in making the credibility determination.

### ii. *Incorrectly Stating Plaintiff worked as a Tax Preparer*

Plaintiff argues that the ALJ incorrectly stated Plaintiff worked as a "tax preparer" in the decision, which is a mischaracterization of the record. (Pl.'s Br. at 12). Defendant responds that this was "clearly a typo." (Def.'s Br. at 11, n. 4). The record as well as Plaintiff's testimony indicates she worked as a receptionist at a tax office where she assisted tax preparers. (R. at 55). Moreover, the VE's testimony at the hearing classified Plaintiff's work as a receptionist, not a tax preparer. (R. at 77). Plaintiff is correct that the ALJ mischaracterized the title of this position. However, this error regarding the title of Plaintiff's position is insignificant to the ALJ's ultimate decision and is therefore harmless.

### iii. *Subjective Complaints of Pain and Swelling Contradicted by the Fact that Plaintiff Only Saw a Rheumatologist Once and That No Treatment Notes from the Visit were in the Record*

Plaintiff asserts that the ALJ incorrectly claimed that the record did not include treatment

39

notes from any specialists, specifically a rheumatologist. (Pl.'s Br. at 12-13). Defendant argues that the ALJ "overlooked" the treatment note and that the mistake was harmless error because "it was but one reason in conjunction with others" for the ALJ to find Plaintiff less credible. (Def.'s Br. at 13-14).

When discussing Plaintiff's credibility, the ALJ stated, "[w]hile the primary care physician treatment notes indicate that the claimant saw a rheumatologist once, the evidence did not contain any such treatment, implying to the undersigned additional visits were not warranted." (R. at 26-27). Instead, the ALJ credits this record as Plaintiff visiting "a new primary care physician." (R. at 27). When discussing the medical record, the ALJ further stated that "this treatment note does not contain any examination of the claimant at that time or any recommended treatment and there is no further treatment with this physician in the record." (*Id.*).

However, Plaintiff did in fact visit a rheumatologist, Dr. Haritha Narla, and the record contains the medical notes. (R. at 258-61). While the medical record completed by Dr. Narla does not indicate that the doctor conducting the examination is a rheumatologist (R. at 258-61), Plaintiff's counsel at the hearing pointed out to the ALJ that the record contained medical notes from a rheumatologist (R. at 48), Plaintiff lists Dr. Narla as a rheumatologist in her "Disability Report - Appeal" form provided to the SSA (R. at 218), Plaintiff asserts that Dr. Narla is in fact a rheumatologist (Pl.'s Br. at 12) and Defendant acknowledges that Dr. Narla is a rheumatologist (Def.'s Br. at 5). Even though the ALJ did not ignore this medical record, she improperly attributed the record to a primary care physician, rather than a specialist. (R. at 26-27). Additionally, when reviewing the record, the ALJ improperly found that the note did not contain

an examination or recommended treatment.  (R. at 27).  The examination by Dr. Narla includes a "review of systems" located on page 261 of the record and a check list of normal or abnormal symptoms on page 259 of the record.  (R. at 259, 261).[5]  The examination by Dr. Narla notes ankle swelling, joint pain, joint swelling, generalized aching, muscle pain, psoriatic rash, scaly plaques and edema in Plaintiff's legs and ankles.  (*Id.*).  Dr. Narla assessed Plaintiff's conditions, which included diagnoses for "1) polyarthralgias, 2) tendinitis elbow, 3) psoriasis - evaluate for PSA, 4) hip bursitis, 5) OA [osteoarthritis]."  (R. at 258).  In regard to treatment, Dr. Narla changed Plaintiff's medication, Naproxen, to 500 mg, recommended another appointment in four (4) weeks, ordered laboratory tests and x-rays, and encouraged exercise. (*Id.*).  The ALJ failed to credit these treatment notes and recommendations as being produced by a rheumatologist.

Moreover, the ALJ improperly asserted that Plaintiff only saw a rheumatologist once and did not return for a second visit which implied to her that "additional visits were not warranted." (*Id.*).  According to the record, Dr. Narla recommended Plaintiff return for an appointment in four (4) weeks, she specifically noted that she wanted to evaluate Plaintiff's psoriasis diagnosis, and she ordered additional laboratory tests and x-rays; these actions indicate that Dr. Narla did in fact recommend additional visits for Plaintiff. (*Id.*).  Plaintiff did not return to the rheumatologist, however, "due to cost constraints," which was indicated in the record during a subsequent visit to Plaintiff's primary care physician, Allyson Andrews.  (R. at 298).

While the ALJ is not required to discuss a treating physician's opinion, the Court does find that the ALJ mischaracterized the record.  The ALJ failed to attribute the treatment notes to

---

[5] The original medical notes appear to be out of order in the administrative record, with the assessment and treatment plan coming first (R. at 258), followed by the checklist of symptoms (R. at 259), then the first page of the progress notes (R. at 260) and finally the social history and review of symptoms (R. at 261).

a rheumatologist, failed to review the entirety of the record, including the examination notes and Dr. Narla's recommendations, and the ALJ's mistakenly believed that additional visits to the rheumatologist were not warranted. The mischaracterization is of particular concern because when evaluating opinion evidence, the ALJ "generally give[s] more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). By disregarding the examination and treatment notes of Dr. Narla, a rheumatologist, the ALJ mischaracterized the medical record as to Plaintiff's treatment by a specialist.

### iv.    ALJ's Failure to Mention Plaintiff's Use of Fluid Pills

Plaintiff argues that the ALJ improperly discredited Plaintiff for her failure to use pain medication while ignoring Plaintiff's use of medication to address her edema. (Pl.'s Br. at 13-14). Defendant does not address the ALJ's failure to discuss Plaintiff's prescription for "fluid pills" in their brief.

In determining Plaintiff's RFC, the ALJ found that Plaintiff's claim that she experiences debilitating pain so severe that she cannot work to not be credible because "she is not prescribed any pain or arthritis medication." (R. at 26). The ALJ properly considered Plaintiff use of only over-the-counter pain medication in determining Plaintiff's credibility in regard to her complaints of debilitating pain.[6] The ALJ does not mention Plaintiff's use of "fluid pills" to treat her edema in the decision.

The medical record does demonstrate that Plaintiff was prescribed fluid pills to address her edema. For example, the record states that Plaintiff received a prescription for "excess fluid"

---

[6] Social Security Ruling 96-7p states that "[t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" may be used to assess the credibility of an

on August 28, 2009 (R. at 291); she again received a prescription for fluid pills on May 14, 2010 (R. at 298); and the consultative examiner specifically noted Plaintiff's use of the prescription medication "as needed for swelling" during his examination report dated August 2, 2010 (R. at 320). The ALJ also noted Plaintiff's use of fluid pills during the hearing. (R. at 52).

Even though the ALJ did not specifically acknowledge Plaintiff's use of fluid pills in the decision, the Court finds that there is no mischaracterization of the evidence regarding Plaintiff's use of medication to address her edema. While the ALJ does not mention Plaintiff's use of "fluid pills," she also does not discredit Plaintiff's claim of edema based on her failure to use medication for it. The Court finds that there is no error based on the ALJ failure to specifically mention Plaintiff's use of fluid pills in the decision.

### v.  *Finding No Significant Limitations in Plaintiff's Daily Activities*

Plaintiff argues that the ALJ mischaracterized the evidence by stating that Plaintiff is not significantly limited in her daily activities. (Pl.'s Br. at 14). Plaintiff directs the Court to review Exhibit 4E, which the ALJ cited to support her finding. (*Id.*). Defendant does not respond to this particular argument in their brief. In discussing Plaintiff's edema, the ALJ states that "while the record shows some intermittent edema, she is able to ambulate effectively without an assistive device, has good range of motion, and she is not significantly limited in her activities of daily living as she is able to prepare meals, drive, clean and shop (Ex. 4E)." (R. at 28).

The Court finds that the ALJ mischaracterizes Plaintiff's Adult Function Report provided to the SSA. (R. at 196-203). In the Adult Function Report completed on June 2, 2010 (Ex. 4E), Plaintiff stated she cannot bend normally to put shoes, socks or pants on without pain, she can no longer wash dishes at the sink, she cannot shave her legs or cut her toenails, she can no longer fix

---

individual's subjective allegations of pain.  SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).

her hair, she can no longer cook at the stove, she cannot complete any household cleaning that involves bending, squatting or crouching, she can no longer complete grocery shopping that requires lifting a heavy amount of groceries and she no longer engages in her favorite hobbies, such as fishing, crocheting or sewing.  (R. at 196-203).

Moreover, Plaintiff's hearing testimony regarding her limited daily activities is also consistent with these prior statements to the agency.  During the hearing, Plaintiff testified that she can no longer do simple things around the house or it takes her twice as long to complete such tasks (R. at 64), she stated that she can no longer cook meals alone and typically eats finger foods (R. at 64, 66), she no longer wears shirts with buttons and has trouble putting on underclothes (R. at 66), she can no longer crochet (R. at 67), she spends most of her day on the couch (*Id.*), she no longer showers when her husband is not home because she has fallen in the shower a few times (*Id.*), she no longer lifts heavy objects (*Id.*), she cannot do the dishes without her hands swelling (R. at 69, 72), she can no longer wear jewelry (R. at 70) and she testified that her husband now does the chores around the house (R. at 71).  This testimony regarding limitations on Plaintiff's daily activities is largely consistent with her prior Adult Function Report provided to the SSA.

The ALJ found that the limitations listed in the Adult Function Report, even though largely corroborated by Plaintiff's hearing testimony, did not demonstrate Plaintiff's daily living activities were significantly limited.  The Court finds the ALJ's analysis of Plaintiff's credibility is based on a mischaracterization of Plaintiff's Adult Function Report.  *See Hines*, 453 F.3d at 565 (holding the ALJ erred by "selectively" citing evidence concerning tasks claimant was capable of performing while ignoring claimant's own testimony of his limitations in those tasks).

The Court finds however, standing alone, this mischaracterization is harmless error because it is just one of many factors considered by the ALJ in weighing Plaintiff's credibility.

## VI.    RECOMMENDATION

For the foregoing reasons, I recommend that:

1. Plaintiff's Motion for Summary Judgment be **GRANTED IN PART and DENIED IN PART** because, while standing alone the ALJ's mischaracterizations of the record when considering Plaintiff's credibility would not require remand, when taken together, remand is required.

The Court acknowledges that at step four the Court's review of an ALJ's credibility determination is quite restrictive and recognizes the deference given to the ALJ's credibility determination.  If the ALJ meets his basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'"  *Sencindiver v. Astrue*, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. February 3, 2010) (Seibert, Mag.) (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).  At a minimum, the Social Security Act requires that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record."  SSR 96-7p, 1996 WL 374,186, at *2.

Based on the mischaracterization of evidence relied upon in making the credibility determination, the Court remands the case to the ALJ to properly consider Plaintiff's credibility. The Court makes the above recommendation recognizing its role is to ensure the ALJ accurately considered all relevant evidence in arriving at his decision, not to suggest what his decision should be upon consideration of the evidence.  However, the multiple mischaracterizations, particularly regarding Plaintiff's treatment by a rheumatologist and the ALJ's analysis of the

Adult Function Report, require remand in this case.

2. Commissioner's Motion for Summary Judgment be **DENIED IN PART and GRANTED IN PART** for the same reasons stated above.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Gina M. Groh, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

**DATED:** February 27, 2014

> */s/ James E. Seibert*
> JAMES E. SEIBERT
> UNITED STATES MAGISTRATE JUDGE